A. David Youssefyeh (185994)
Liza Youssefyeh (192945)
A|D|Y LAW GROUP, P.C.
1925 Century Park East, Suite 1380
Los Angeles, California  90067
Telephone:   (310) 772-2872
Facsimile:    (310) 772-0020

Attorneys for Plaintiff and Creditor,
KOUROSH MALEKAN

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>PETER PEDRAM ETESAMNIA<br><br>―――――――――――――――――<br>KOUROSH MALEKAN, an individual,<br>          Plaintiff,<br>     v.<br><br>PETER PEDRAM ETESAMNIA, an individual,<br>          Defendant. | Adv. No.  2:13-ap-01695-TD<br><br>Case No. 2:12-bk-43661-TD<br><br>Chapter: 7<br><br>**SECOND AMENDED ADVERSARY COMPLAINT FOR:**<br><br>1) **DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(2)(A);**<br>2) **DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(2)(B);**<br>3) **DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(6);**<br>4) **DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(3)(B);**<br><br>**DEMAND FOR JURY TRIAL** |

– 1 –

SECOND AMENDED ADVERSARY COMPLAINT

Plaintiff, Kourosh Malekan ("Malekan"), hereby complains against Defendant Peter Pedram Etesamnia ("Etesamnia") as follows:

## JURISDICTION

1. This Bankruptcy Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157 and 11 U.S.C. § 523 because this proceeding arises in or is related to the pending bankruptcy case of *In re Peter Pedram Etesamnia*, presently pending before the United States Bankruptcy Court for the Central District of California.

2. This is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b).

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

## PARTIES

4. Plaintiff Kourosh Malekan (hereinafter "Plaintiff") is, and at all relevant times mentioned herein was, an individual living in the County of Los Angeles, State of California.

5. Plaintiff is informed and believes that Defendant Peter Etesamnia, aka Pedram Etesamnia ("Etesamnia" or "Defendant") is, and at all relevant times mentioned herein was, an individual residing in the County of Los Angeles, State of California. Mr. Etesamnia is also a convicted criminal (18 U.S.C. § 1030(a)).

6. Plaintiff is informed and believes that third-party Jalinous Nehouray ("Nehouray") is, and at all relevant times mentioned herein was, an individual residing in the County of Los Angeles, State of California. At all times herein mentioned, Nehouray was an agent for Defendant Etesamnia acting on his behalf and per his authority.

7. Plaintiff is informed and believes that third-party Empire Global Mint, Inc. ("Empire") is a corporation organized under the laws of the State of California with its principal place of business in Los Angeles County.

8. Plaintiff is informed and believes that third-party Pars Mint, Inc. ("Pars") is a corporation organized under the laws of the State of California with its principal place of business in Los Angeles County.

9. Plaintiff is informed and believes that third-party <u>Demetrius Navarro</u> ("Navarro") is, and at all relevant times mentioned herein was, an individual residing in the County of Los Angeles, State of California.

10. Plaintiff is informed and believes that third-party <u>D Street Films</u> ("D Street") is a limited liability company organized under the laws of the State of California with its principal place of business in Los Angeles County.

11. At all times herein mentioned, Defendant Etesamnia was a shareholder, officer and/or director of Pars and Empire so that he controlled these companies that directed the use of the funds belonging to these companies.

12. Plaintiff is informed and believes and thereupon alleges that, at all times mentioned herein, Nehouray, Pars and Empire were the agent, employee, partner, member, subsidiary or related corporation, alter ego and/or joint venturer of Defendant Etesamnia and were acting within the course and scope of that relationship and with the knowledge, consent and/or ratification of Defendant Etesamnia.

## **GENERAL ALLEGATIONS**

13. The Defendant is an individual residing in the County of Los Angeles, State of California, is the debtor in bankruptcy case no. 2:12-bk-43661-TD which was filed on October 4, 2012 under Chapter 7 of the U.S. Bankruptcy Code ("Petition").

14. Plaintiff is the holder of a claim against Defendant arising prior to the filing of the Petition.

15. Plaintiff was not listed as a creditor of Defendant in the original schedules that Defendant filed with the Court nor was Plaintiff otherwise aware of the Petition.

16. Plaintiff has filed a Complaint against Defendant in Los Angeles Superior Court as Case No. SC118749 ("State Court Matter"). A copy of the First Amended Complaint in that case is attached hereto Exhibit A and incorporated herein by this reference.

17. On June 4, 2013, a process server for the Plaintiff served Defendant with a copy of the First Amended Complaint. On June 5, 2013, Defendant amended his schedules and

named Plaintiff as a creditor and on August 20, 2013, he filed an Answer in the State Court Matter.

18.    The State Court Matter is currently pending in the Los Angeles Superior Court. Plaintiff is filing this Complaint to reserve his rights against the Defendant but requests that this matter be stayed pending outcome of the State Court Matter.

19.    In addition, Plaintiff's claims arise under non-bankruptcy law and can be most expeditiously resolved in a non-bankruptcy forum.

## **ALTER EGO ALLEGATIONS**

20.    At all times mentioned herein Defendant Etesamnia and was a shareholder, and/or director, and/or officer, and alter ego of Empire and Pars, and in doing the things herein described, Defendant Etesamnia was acting within the scope of such authority.

21.    There exists, and at all times herein mentioned existed, a unity of ownership between Defendant Etesamnia on the one hand, and Empire and Pars and the other hand, such that any individuality and separateness between Defendant Etesamnia and Empire and Pars have ceased and Empire and Pars are the alter egos of Defendant Etesamnia.

22.    Plaintiff is informed and believes that Empire and Pars are, and at all times herein mentioned were, the alter egos of Defendant Etesamnia and there exists, and at all times herein mentioned has existed a unity of interest and ownership between them such that any separateness has ceased to exist and that Defendant Etesamnia has used the assets of the corporations for his personal use, causing the assets of the corporations to be transferred to him without adequate consideration, and that he also withdrew funds from Empire and Pars' bank accounts for his personal use.

23.    For example: 1) on October 7, 2008, Defendant Etesamnia withdrew $1,500 from the Companies' account for his personal expenses; 2) on October 27 and December 22, 2008, and February 2, 2009, Defendant Etesamnia charged his personal lunches to Pars and Empire although no business of either company was discussed and/or occurred during lunch; 3) on February 2, 2009, Defendant Etesamnia purchased a laptop for his personal

use to the Companies; and 4) on September 20, 2010, Defendant Etesamnia charged a personal airline ticket to the Companies.

24.　Plaintiff is informed and believes that Defendant Etesamnia, on one hand, and Empire and Pars, on the other hand, are and at all times herein mentioned were, alter egos of each other and there exists, and at all times herein mentioned there has existed a unity of interest and ownership between them such that any separateness between them has ceased to exist in that Defendant Etesamnia completely, controlled, dominated, managed and operated Empire and Pars and commingled their assets with his personal assets to suit the convenience of Defendant Etesamnia.

25.　Plaintiff is informed and believes that Empire and Pars are, and at all times herein mentioned were, mere shells, instrumentalities, and conduits through which Defendant Etesamnia carried on his business in corporate name exactly as they had conducted prior to incorporation, exercising complete control and dominance of such business to such an extent that any individuality or separateness of Empire and Pars and Defendant Etesamnia does not exist and at all times herein mentioned did not exist.

26.　Plaintiff is informed and believes that at all times mentioned herein, including but not limited to the time they entered into the contracts with Plaintiff, Empire and Pars were severely undercapitalized and were unable to satisfy their financial obligations to Plaintiff such that the adherence to the fiction of separate existence between Empire and Pars, on one hand, and Defendant Etesamnia on the other hand, would sanction fraud and promote injustice.

27.　Plaintiff is informed and believes that adherence of fiction of separate existence of Empire and Pars as entities distinct from Defendant Etesamnia would permit an abuse of the corporate privilege and sanction fraud and promote injustice, as Defendant Etesamnia has deliberately rendered Empire and Pars financially unable to respond to a money judgment.

//

**FACTS**

*The Commemorative Coins*

28.  Plaintiff Kourosh Malekan and third-party Nehouray were friends for many years.

29.  On or about October 15, 2007, Nehouray introduced Plaintiff to Defendant Etesamnia and told him about a business idea that Nehouray was planning to execute with Defendant Etesamnia. During the meeting, Defendant Etesamnia represented to Plaintiff that he, along with Nehouray, had formed two companies, Empire and Pars, for the purpose of producing commemorative gold coins for sale to the public ("Empire" and "Pars," are collectively referred to as the "Companies").

30.  During the meeting with Defendant Etesamnia, and his agent Nehouray, Defendant Etesamnia represented to Plaintiff that Pars was formed to produce and sell a gold coin commemorating Iranian Statesman Amir Kabir, a historical figure famous in Iran (there is a long tradition of Iranians taking gold coins as gifts for each other for various celebratory events, including weddings), and Empire was formed for the purpose of producing and selling coins bearing licensed images from Fox studios and Playboy.

31.  In particular, Defendant Etesamnia, represented to Plaintiff that he should invest into Empire and Pars, based on the following:

    1)  Defendant Etesamnia believed in the businesses so much that he and Nehouray would be investing their own funds into the Companies;

    2)  The funds Plaintiff would invest into the Companies would be used <u>solely</u> for the purpose of creating, manufacturing and marketing the coins herein described (*i.e.* Amir Kabir, Fox and Playboy).

    3)  Defendant Etesamnia and Nehouray had the know-how, relationships and connections to get the best pricing for creating, manufacturing and marketing of such coins;

    4)  Defendant Etesamnia had connections in Dubai that he was specifically going to use for the marketing and sale of the Amir Kabir coins, and that there was an extensive demand for such coins;

– 6 –

    5) There had been good progress towards creating the coins so that manufacturing the coins was imminent, and Plaintiff would be able to see the dies, sculpts or molds of the coins soon;

    6) Creating and manufacturing the molds for each of the three types of coins would only cost $80,000 each;

    7) The licensing for the Fox characters would cost $50,000;

    8) That in return for an investment of $160,000 into the two Companies, Plaintiff would receive a 50% equity share, or have the option of asking for the return of his investment with interest, without right to profits.

32. Defendant Etesamnia not only made these representations verbally, but he also showed Plaintiff various financial documents for Pars and Empire purporting to show not only the expected expenses of producing the three types of gold coins, which why Plaintiff's investment was needed, but also the expected sales and profits from selling these coins.

33. Based on these representations, over the next thirty (30) days, Plaintiff gave Defendant Etesamnia, Nehouray (as agent for Etesamnia), Empire and Pars a total of over $160,000 in cash and checks ("Initial Funds").

34. However, at the time Defendant Etesamnia made these representations to Plaintiff, he knew them to be untrue. In fact:

    1) Defendant Etesamnia did not intend to, and never did, invest his own funds into either Pars or Empire;

    2) The funds Plaintiff invested into the Companies were not being used solely for the purpose of creating, manufacturing and marketing the coins herein described (*i.e.* Amir Kabir, Fox and Playboy), and were in fact used for personal expenses and other business ventures of Defendant Etesamnia, unrelated to Plaintiff.  Specifically, with respect to Defendant Etesamnia, Plaintiff's funds were funneled to other "gold" coin companies (unrelated to Pars and Empire), real estate ventures, loan modification ventures, and film/entertainment ventures (including but not limited to D Street Films), and

to purchase Rolex watches, and other antiques, coins and rugs which were sold to third parties by Defendant Etesamnia the proceeds of which were kept by him;

3) Neither Defendant Etesamnia, nor his agent Nehouray, had the know-how, relationships and connections to get the best pricing for creating, manufacturing and marketing such coins;

4) Moreover, Defendant Etesamnia had no intention of using the monies received from Plaintiff to pay his vendors and in fact he failed to pay the vendors for which he told Plaintiff he needed money;

5) The manufacturing of the coins was not imminent, as represented by Defendant Etesamnia, and to this day, Plaintiff has not seen the dies, sculpts or molds of any of the coins he had paid for, which he understands and believes were each converted by Defendant Etesamnia for his personal use;

6) The molds for the coins did not cost $80,000 each, as represented by Defendant Etesamnia to Plaintiff, both in writing and orally, but approximately $20,000 in total;

7) The licensing for Fox characters did not cost $50,000 as represented by Defendant Etesamnia to Plaintiff, both orally and in writing, but only $25,000;

8) In return for his investment of $160,000 in the two Companies, Plaintiff did not receive a 50% equity share, nor did he get or was given the option for the return of his investment, because Defendant Etesamnia intended to use the funds, and did use the funds, for his own personal purposes.

35. Soon after providing the Initial Funds to Defendant Etesamnia, Defendant Etesamnia and Nehouray (as agent for Etesamnia), started asking Plaintiff for more funds.

36. In particular, over the next nine months, in a series of face to face meetings at restaurants, Etesamnia's home, Malekan's home, text messages and emails, Defendant Etesamnia represented to Plaintiff orally, and by showing him various alleged financial statements/documents for the Companies, that the costs of development and production of

– 8 –

the coins were higher than what he and Nehouray expected due to unforeseen manufacturing costs, but that their licensing and marketing plans were progressing well and that there was high demand for the coins.

37. During this time Plaintiff Malekan was the primary caregiver to his cancer ridden father and was unable to devote a lot of time to following Nehouray's and Defendant Etesamnia's progress. Consequently, he was unable to verify Defendant Etesamnia's representations concerning the business. Defendant Etesamnia and Nehoray were each aware of Plaintiff's fragile mental state and his lack of attention to their business dealings and made these representations to Plaintiff about the funds required and the progress of the Companies knowing that Plaintiff did not have the time to verify them and would thus rely on their representations and documents concerning the status of the coin projects without being able to verify them.

38. However, the representations by Defendant Etesamnia were false and Defendant Etesamnia knew that they were false because as noted herein above, Defendant Etesamnia was not using Plaintiff's funds to manufacture gold coins, but rather to finance his own lifestyle.

39. By the end of July 2008, and based upon the representations of Defendant Etesamnia to Plaintiff both orally, in text messages, emails, as well as by emailing and showing Plaintiff various financial statements purporting to show the use of Plaintiff's funds for the manufacturer of gold coins, Plaintiff gave Defendant Etesamnia another $150,000 in cash and checks.

40. On or about July 30, 2008, Plaintiff met with Defendant Etesamnia and Nehouray at the Polo Lounge in Beverly Hills and during this meeting Defendant Etesamnia represented orally and in writing, by showing Plaintiff various financial statements for the Companies, to Plaintiff that both Companies were coming along well but that production costs were continuing to rise so more money was needed to finish production of the gold coins.

41. Defendant Etesamnia knew that this was false because as noted above, the funds received from Plaintiff were not used by Defendant Etesamnia for production of gold coins,

– 9 –

SECOND AMENDED ADVERSARY COMPLAINT

but rather for the personal benefit of Defendant Etesamnia. To the extent that Plaintiff's funds were used for the production of gold coins that process was far behind schedule and Defendant Etesamnia had no reasonable basis for asserting to Plaintiff that the production schedule was going ahead as planned.

42.    Based upon these representations, and the documents shown to Plaintiff by Defendant Etesamnia showing how Plaintiff's funds were used for the production of gold coins, on or about August 4, 2008, Plaintiff provided Defendant Etesamnia with another $80,000, and then another $25,000 on or about December 2008.

43.    In 2009, after not seeing any results from the funds that he provided to Defendant Etesamnia, Plaintiff started inquiring of Defendant Etesamnia about the status of coins that were supposed to be produced.

44.    Thereafter, Defendant Etesamnia, in an effort to keep stringing Plaintiff along, showed Plaintiff a "sample" Amir Kabir coin and showed him plans for other coins that were "about to be produced." Consequently, in November 2009, believing that everything was on target, and based upon Defendant Etesamnia's representations, Plaintiff gave one last payment of $12,500 to Defendant Etesamnia.

45.    Until in or about June 2010, Defendant Etesamnia continued meeting with Plaintiff in person to give Plaintiff updates, orally and by showing him financial statements and marketing materials for the two Companies, on the work him and Nehoray were allegedly doing on the projects and continued to represent to Plaintiff that he was moving forward on the plan to manufacture the coins.

46.    To date, however, Defendant Etesamnia has failed to manufacture a single commemorative coin, nor has he been able to produce the dies, molds and sculpts that were to serve as the basis of the coins for which he obtained the funds from Plaintiff. Further, Defendant Etesamnia has refused to provide a full accounting from Pars and Empire for the monies that Pars and Empire allegedly spent in trying to manufacture the coins.

SECOND AMENDED ADVERSARY COMPLAINT

47.  At the time Defendant Etesamnia made the representations in 2007, and thereafter, when he continued to make further representations to Plaintiff to get more funds, he knew them to be untrue. In particular:

   a)  Defendant Etesamnia did not intend to, and never did, invest his own funds into either Pars or Empire;

   b)  The funds Plaintiff invested into the Companies were not being used solely for the purpose of creating, manufacturing and marketing the coins herein described (*i.e.* Amir Kabir, Fox and Playboy), and were in fact used for personal expenses and other business ventures of Defendant Etesamnia, unrelated to Plaintiff.  Specifically, with respect to Defendant Etesamnia, Plaintiff's funds were used to create and run other "gold" coin companies, real estate ventures, loan modification ventures, and film/entertainment ventures, and purchase of Rolex watches, and other antiques, coins and rugs sold to third parties by Defendant Etesamnia and proceeds of which were kept by him;

   c)  In fact, the final two payments for the Playboy licensing rights were not paid by Defendant Etesamnia to Playboy, despite the fact that Defendant Etesamnia had specifically asked Plaintiff for funds to pay the Playboy licensing fees and thus all monies spent for the initial production of Playboy coins (including packaging, molds, sculpting, etc.) and were lost;

   d)  Neither Defendant Etesamnia, nor Nehouray, had the know-how, relationships and connections for manufacturing and marketing such coins;

   e)  Moreover, despite his representations to Plaintiff, both orally and in writing, that Plaintiff's funds would be used to pay vendors for production of the gold coins, Defendant Etesamnia pocketed the money and failed to pay the vendors for which he had told Plaintiff they need money;

   f)  Defendant Etesamnia used Plaintiff's funds for trips to Dubai and Iran to advance his other ventures, and/or sell coins, including Amir Kabir coins (to

– 11 –

the extent they were even created), under another company name, including but not limited to "Simia;"

g) The progress on the creation and manufacturing of the coins was not imminent, as represented, and to this day, Plaintiff has not seen the dies, sculpts or molds of any of the coins he had paid for, which he understands and believes were each converted by Defendant Etesamnia for his personal use;

h) The molds for the coins did not cost $80,000 each, as represented by Defendant Etesamnia to Plaintiff both orally and in writing, but approximately $20,000 total;

i) The licensing for Fox characters did not cost $50,000 as represented by Defendant Etesamnia to Plaintiff both orally and in writing, but only $25,000;

j) In return for his investment of $160,000 into the two Companies, Plaintiff did not receive 50% equity share, nor did he get or was given the option for the return of his investment, because Defendant Etesamnia and Nehouray intended to use the funds, and did use the funds, as their own personal piggy bank.

48. To add insult to injury, Plaintiff is informed and believes Defendant Etesamnia, Nehouray and Empire were in a dispute with Fox over the licensing rights, for which they received $135,000 from Fox. Defendant Etesamnia and Nehouray never informed Plaintiff of the receipt of those funds, and never gave him a penny (despite the fact that they also received the return of the $50,000 license fee paid by Plaintiff). But rather, they split the funds between themselves.

49. As a result of Defendant Etesamnia's misrepresentations, and Plaintiff's detrimental reliance thereon, Plaintiff has suffered damages, as set forth herein.

//

*The Movie Production Investment*

50. In, or about, October 27, 2008, Nehouray and Defendant Etesamnia also approached Plaintiff with an investment opportunity in a movie. In particular, Defendant Etesamnia presented orally to Plaintiff that he had invested in the film project, and that he too should invest in the project. As such, he introduced Plaintiff to Navarro.

51. Prior to making an investment, Plaintiff met with Navarro, who told him that he is the President of D Street and that Nehouray and Defendant Etesamnia had already invested in D Street and that the purpose of the investment was to create a movie.

52. The terms of the investment were as follows: 1) Plaintiff would get credit as "Co-Executive Producer;" and 2) Plaintiff would receive 13.33% of the films' gross receipts.

53. Based upon Nehouray, Navarro and Defendant Etesamnia's representations that: 1) Nehouray and Defendant Etesamnia had invested in the movie and that it was about to be made and get distribution, Plaintiff invested $25,000 in a film project with Defendant D Street.

54. Plaintiff is informed and believes that Defendant Etesamnia had in fact never invested in the movie, and that D Street Films and Demetrius Navarro were fronts for Nehouray and Defendant Etesamnia and that to the extent Defendant Etesamnia and Nenouray "put in" any funds, it was from the funds given for the licensing, creation, manufacturing and marketing of the coins, and/or after Plaintiff invested $25,000 in the movie, Nehouray, Navarro and Defendant Etesamnia, split up his funds for their personal gain as there was no movie to be made.

55. Although Plaintiff has asked Nehouray, Defendant Etesamnia and Navarro for information concerning the movie, and in spite of the fact that Navarro, Nehouray and Defendant Etesamnia have made multiple representations to Plaintiff that the movie is being made, to date, there is no movie and no accounting of Plaintiff's funds invested in the movie.

//

SECOND AMENDED ADVERSARY COMPLAINT

*The Supplement Investment*

56.   In or about September 2008, in a meeting with Plaintiff, Defendant Etesamnia represented to Plaintiff, orally and by showing him documents from BTI, that he had connections to get licensing from BTI, a nutritional supplement company, for overseas distribution rights.  Defendant Etesamnia represented to Plaintiff that should he invest $21,500, for 50% of the profits, or return of investment (with interest), Defendant Etesamnia would also invest the same amount of funds in the venture.

57.   Based on Defendant Etesamnia's representations, and in reliance thereon, Plaintiff gave BTI a check in the amount of $21,500.

58.   However, at the time that Defendant Etesamnia, made the representations to Plaintiff he knew his representations were not true, and had no intent to obtain the rights from BTI.

59.   In fact, once Defendant Etesamnia found out from Plaintiff that he has sent in his check to BTI, Defendant Etesamnia contacted BTI and arranged for a refund of Plaintiff's investment back to him personally, pocketing the money for his personal uses.

## FIRST CLAIM FOR RELIEF

## (DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(2)(A))

60.   Plaintiff hereby incorporates by reference paragraph 1 to 59 of this Complaint as if set forth in full herein.

61.   As noted herein above, on multiple occasions, the Defendant Etesamnia obtained money and an extension, renewal, and/or refinancing of credit by false pretenses, a false representation, and/or actual fraud.

62.   That the representations made by Defendant Etesamnia were false and Defendant Etesamnia knew them to be false at the time that he made them.

63.   That Defendant made said representations with the intent of deceiving Plaintiff.

64.   Plaintiff reasonably relied upon Defendant Etesamnia's representations.

65. Due to Defendant Etesamnia's representations Plaintiff has been damaged in an amount not less than $500,000.

66. Based upon the above conduct, the debt owed by Defendant Etesamnia to Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

## SECOND CLAIM FOR RELIEF

## (DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(2)(B))

67. Plaintiff hereby incorporates by reference paragraph 1 to 59 of this Complaint as if set forth in full herein.

68. As noted herein, in order to induce Plaintiff to give him money, Defendant Etesamnia provided Plaintiff with financial statements respecting the financial condition and/or financial activities of Pars and Empire that were materially false and/or asked Plaintiff to rely upon documents respecting Empire and/or Pars' financial condition and/or financial activities that the Defendant had already provided to Plaintiff that were materially false.

69. Plaintiff reasonably relied upon Defendant Etesamnia's representations in the documents concerning the financial condition and financial activities of Empire and Pars.

70. Defendant Etesamnia knew about the falsity in these documents but he nevertheless caused the Plaintiff to believe in these documents and representations with the intent to deceive Plaintiff into giving him money and an extension, renewal, and/or refinancing of credit.

71. At no time prior to giving money to Defendant Etesamnia, or his alter ego, nor at any time thereafter, did Defendant Etesamnia disclose to Plaintiff that he had no intention of using the money for its intended purpose.

72. Due to Defendant Etesamnia's representations Plaintiff has been damaged in an amount not less than $500,000.

73. Based upon the above conduct, the debt owed by Defendant to Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

## THIRD CLAIM FOR RELIEF

### (DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(6))

74. Plaintiff hereby incorporates by reference paragraph 1 to 59 of this Complaint as if set forth in full herein.

75. As noted herein Defendant Etesamnia willfully and maliciously damaged Plaintiff's claims against Defendant Etesamnia arise out of 11 U.S.C. § 523(a)(6).

76. Based upon the above conduct, the debt owed by Defendant Etesamnia to Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(3)(B).

## FOURTH CLAIM FOR RELIEF

### (DETERMINATION OF NON-DISCHARGEABILITY 11 U.S.C. § 523(a)(3)(B))

77. Plaintiff hereby incorporates by reference paragraph 1 to 59 of this Complaint as if set forth in full herein.

78. As noted herein, Defendant Etesamnia failed to list or schedule Plaintiff as a creditor despite the fact that Plaintiff has been hounding Defendant Etesamnia for years asking for his money back and accusing Defendant of committing fraud.

79. Plaintiff's claims against Defendant Etesamnia arise out of 11 U.S.C. § 523(a)(2).

80. Plaintiff had no prior notice of Defendant Etesamnia's bankruptcy until Defendant Etesamnia amended his schedules in June to add Plaintiff as a creditor.

81. Based upon the above conduct, the debt owed by Defendant Etesamnia to Plaintiff is non-dischargeable pursuant to 11 U.S.C. § 523(a)(3)(B).

//

//

//

SECOND AMENDED ADVERSARY COMPLAINT

WHEREFORE, the Plaintiff prays for judgment against Defendant Etesamnia as follows:

**ON THE FIRST, SECOND AND THIRD FOURTH CAUSES OF ACTION**

1. That Defendant's debt to Plaintiff is non-dischargeable;
2. For reasonable attorneys' fees;
3. For costs of suit incurred herein; and
4. For such other and further relief that is just and appropriate.

DATED: September 10, 2014                    Respectfully submitted,

A|D|Y Law Group, P.C.

By:_____/s/_____

A. David Youssefyeh

Attorneys for Plaintiff and Creditor,
KOUROSH MALEKAN

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

DATED: September 10, 2014                     Respectfully submitted,

A|D|Y Law Group, P.C.


By:_____/s/_____

A. David Youssefyeh

Attorneys for Creditor,
KOUROSH MALEKAN

SECOND AMENDED ADVERSARY COMPLAINT

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

1925 Century Park East, Suite 1380, Los Angeles, CA  90067

A true and correct copy of the foregoing document entitled (*specify*): Second Amended Complaint
_____
_____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 09/12/2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Edmond Nassirzadeh - ed@nasslawfirm.com; Bruce Landau - BLG26@aol.com; Jason M Rund - trustee@srlawyers.com, jrund@ecf.epiqsystems.com; United States Trustee (LA) - ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 09/12/2014, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Thomas B. Donovan - 255 E. Temple Street, Courtroom 1345, Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 09/12/2014 | A. David Youssefyeh | /s/ |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**